**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| MICHAEL PETTY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CAUSE NO. 1:21-cv-538 |
| ) | |
| AMERICAN SENIOR COMMUNITIES, ) | |
| ) | |
| Defendant. ) | |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

The Plaintiff, Michael Petty ("Plaintiff" and/or "Petty"), by counsel, hereby brings this action against the Defendant, American Senior Communities ("Defendant"), alleging that Defendant has violated his rights as protected by Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 *et seq.* ("Section 1981"), and the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.* ("FMLA").

**I. PARTIES, JURISDICTION, AND VENUE**

1.   At all relevant times, Petty has resided within the Southern District of Indiana, Indianapolis Division.

2.   Defendant is a corporation that is located and conducts business within the Southern District of Indiana, Indianapolis Division.

3.   Jurisdiction is conferred on this Court by 28 U.S.C. § 1331, 28 U.S.C. § 1343, 42 U.S.C. § 2000e-5(f)(3), 29 U.S.C. § 2617(a)(2), and 42 U.S.C. § 1981.

4.   At all relevant times, Petty was an "employee" of Defendant within the meaning of that term under Title VII, 42 U.S.C. § 2000e(f).

5. At all relevant times, Defendant was Petty's "employer" within the meaning of that term under Title VII, 42 U.S.C. § 2000e(b).

6. In April 2020, Petty was an "eligible employee" as that term is defined by the FMLA.

7. At all relevant times, Defendant employed 50 or more employees within a 75-mile radius of Williams' worksite.

8. Petty has satisfied his obligation to exhaust his administrative remedies, having timely filed a Charge of Discrimination ("Charge") with the U.S. Equal Employment Opportunity Commission ("EEOC"). Petty received his "Dismissal and Notice of Rights" ("Notice") from the EEOC and now timely files this lawsuit within ninety (90) says after receipt of said Notice.

9. All of the events, transactions and occurrences giving rise to this lawsuit occurred within the geographical environs of the Southern District of Indiana, Indianapolis Division, and all parties are located therein.

10. Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

## II. FACTUAL ALLEGATIONS

11. Petty is an African-American male who began his employment with Defendant, a residential eldercare facility, on or about October 13, 2015.

12. At all times relevant to this Complaint, Petty worked for Defendant as a Nursing Schedule Coordinator and Central Supply Clerk at Defendant's Eagle Valley Meadows facility (3017 Valley Farms Rd, Indianapolis, IN 46214). Petty performed his job duties in a competent and satisfactory manner, carrying out the essential functions of the job, and received no discipline or notice of performance concerns during his assignment at Eagle Valley Meadows.

13. During the early months of the COVID-19 pandemic, in April 2020, Petty's infant child's daycare closed.

14. On April 20, 2020, Petty inquired about leave options and spoke with Norma Seib ("Seib") the Director of Nursing at Defendant's facility. Seib informed there were no COVID-19 leave options available to him; however, he had the option of moving to PRN (as needed) status or resigning his employment.

15. Petty then asked if he could take FMLA leave and Seib told him he was "not eligible" for FMLA. Petty responded that according to the notice posted at Defendant's facility, he believed he was eligible.

16. Seib told Petty he needed to contact Summer Hall ("Hall") in Human Resources at Defendant's home office. Seib then told Petty he was being moved to PRN status, even though he had not agreed to this.

17. Defendant's demotion of Petty to PRN status for asking about FMLA leave constitutes retaliation and is an adverse employment action.

18. Later that afternoon, Petty called Summer Hall, who told him he had "no COVID leave options available." Petty inquired about FMLA and Hall asked "what makes you think you are eligible for FMLA?"

19. Petty told Hall he had read the notice at Defendant's facility and believed he was eligible because he had an infant child under one year of age. Hall responded "you must really want to get out of work."

20. Petty responded that he was merely inquiring if he was eligible and wanted to get that process started. Hall then responded that she could not help him, and that FMLA leave was started "at the building level."

21. Petty then reached out to Tara McGloughlin ("McGloughlin"), the Executive Director of his building. McGloughlin instructed him to contact Michelle Stephens ("Stephens"), the HR/Payroll Coordinator for the building. Petty was able to acquire FMLA paperwork from Stephens around 7 p.m. that evening.

22. On April 21, 2020, Petty completed his portion of the FMLA paperwork and returned it to Stephens.

23. On April 22, 2020, Stephen e-mailed Petty paperwork to change him to PRN status. Petty refused to sign it as he had never agreed to this substantial change in his job duties.

24. On April 23, 2020, Petty received an e-mail from McGloughlin, who told Petty he was immediately being placed on PRN. McGloughlin claimed Petty had made a "verbal agreement" to switch to PRN, despite the fact that such verbal agreements are specifically prohibited in Defendant's employee handbook and that Petty had never agreed to switch to PRN status.

25. Following this conversation, Petty discovered that Defendant had deactivated his access to job essential software.

26. Defendant's demotion of Petty to PRN status for attempting to exercise his FMLA rights constitutes retaliation and is an adverse employment action.

27. Later that day, Petty called Defendant's HR compliance line to complaint about McGloughlin interfering with his FMLA rights and retaliating against him for attempting to exercise his FMLA rights. Petty's complaints constitute protected activity.

28. On April 24, 2020, Petty received a call from Summer Hall, who pressured Petty again to sign the PRN agreement. He declined and asked why he was being treated differently than

his coworkers in the FMLA process, as other coworkers were not demoted to PRN or asked to resign after inquiring about FMLA leave.

29. Hall replied, "I'm sure it's not because you are black. My grandmother was black and that makes me a quarter black, so I understand your concerns and frustrations."

30. Later that day, Petty was e-mailed additional FMLA paperwork and asked to provide a copy of his child's birth certificate. Hall also e-mailed Petty again, asking about the non-existent "verbal agreement" regarding PRN status.

31. On April 25, 2020, Hall e-mailed Petty and stated that Petty's attendance indicated he had agreed to go on PRN status, but that he was still eligible for FMLA. Petty replied, reminding Hall of his previous refusals to sign any PRN agreement and asking for clarity on the involuntary demotion imposed by Defendant. Hall did not reply.

32. On April 26, 2020, Petty received an e-mail from L. Ewert stating that his FMLA paperwork would be reviewed by the legal department.

33. That same day, Petty called Defendant's HR Compliance Line to report Hall's racially-charged comments and interference in the FMLA process.

34. On Monday, April 27, 2020, Petty spoke with C. Newsome, Defendant's Human Resources Director, regarding his complaints. Later that day, Petty submitted a statement to Newsome.

35. On May 4, 2020, Petty was approved for FMLA leave.

36. Petty returned from FMLA leave on July 10, 2020.

37. Upon his return, Petty met with Angie Bowman ("Bowman"), an HR Representative for Defendant, and Seib. Petty was given a new job description and was asked to sign it on the spot.

38. Petty stated his concerns of previous FMLA interference and comments by Hall and explained that he was hesitant to sign it without resolution of those complaints. Petty also wished to view his previous job description to compare it with the new one, but his previous job description could not be located in his file.

39. Nevertheless, Petty signed the job description under pressure. He was given a list of new job duties and told he would no longer be conducting interviews with new applicants. These new job duties constitute retaliation for Petty's engagement in protected activity.

40. On July 17, 2020, Petty was scheduled for training with Jessica Hubbs ("Hubbs") and Seib. Petty expressed concerns about black employees being selected for weekend shifts more than white employees, and relayed a story he heard from another employee, Paula Pernell, about a white employee bragging about not having to work weekends.

41. Petty's complaint about disparate treatment in scheduling due to race constitutes statutorily protected activity.

42. On July 20, 2020, Petty received a call from Heather Howe ("Howe"), Defendant's VP of Human Resources, to follow up on previous complaints. Howe told Petty that Hall does not handle FMLA and she was not sure why Petty was directed to her for his FMLA application. Petty again reported Hall's racially-charged comments to Howe.

43. Petty also relayed additional concerns about not receiving a supposed "building wide" pay raise that his female coworkers received; his change in job duties following his return from FMLA, and concerns about disparate treatment due to race in scheduling and job assignments. These complaints constitute statutorily-protected activity.

44. On August 7, 2020, Petty contacted Alberta Taybior ("Taybior"), the new building director at Eagle Valley, and reiterated his earlier complaints. Taybior responded that he would meet with Petty the following Monday; this meeting never took place.

45. On August 10, 2020, Petty witnessed Seib force Kristy Felix ("Felix"), Defendant's evening shift supervisor, to alter a report regarding a patient before being allowed to leave. Specifically, Seib asked Felix to change a report because "it looks bad, and corporate is in the building asking questions. You need to change the part referencing sexually aggressive behaviors towards men before you leave." Felix did as instructed, albeit under duress.

46. After Petty clocked out that same day, Seib ran him down in the parking lot, telling him a resident had been placed on "1 on 1" monitoring and Seib needed Petty to work an additional shift and monitor this patient.

47. Petty, who had not been feeling well throughout the day and cognizant of the ongoing COVID-19 pandemic, told Seib and Taybior he was not feeling well and did not want to make any residents sick. He was told "it's probably nothing" and that he needed to stay and work the additional shift.

48. Petty pointed out that female workers who complained of not feeling well earlier that day were allowed to go home and asked if he was being punished for his complaints and reports of disparate treatment.

49. Seib required Petty to recite all of his symptoms in front of the other coworkers. After he had finished, he was instructed to leave and not return until he had a negative COVID-19 test.

50. After he left, Taybior called Petty and told him to return his work phone.

51. Petty later found out the "1 on 1" resident Seib wanted him to supervise was the resident who had been displaying sexually aggressive behaviors towards men.

52. On August 11, 2020, Petty reported Seib's behavior to Taybior via Defendant's "DocsInk" app. This constitutes statutorily-protected activity. Taybior's response was to deactivate Petty's account.

53. On August 13, 2020, Petty contacted the HR compliance line to report the disparate treatment he was subjected to by Seib and Taybior, as well as the incident with Felix.

54. Petty met with Taybior on August 24, 2020 and September 2, 2020. Petty reiterated his concerns about disparate treatment in general and about Seib specifically. This constitutes statutorily-protected activity.

55. Taybior told Petty that she knew "where [Seib's] heart was" and that Petty should approach her directly if she does or says something offensive, in contradiction of Defendant's policies. Taybior encouraged Petty to "give it time" and assured him "things will get better or somebody will have to leave."

56. On September 3, 2020, Seib scolded Petty for another employee coming in late the previous day. Petty reminded Seib that he has no control when an employee shows up for work; Seib insisted it was his fault.

57. Later that day, Petty met with Seib and Taybior regarding Pernell's complaint about scheduling favoring white employees. Petty was told to change Pernell's schedule without consulting her; Petty opposed this, feeling it was retaliation against Pernell for complaining. Taybior insisted that scheduling was his responsibility and if he failed he would be terminated.

58. Petty questioned why the white employee that was the subject of Pernell's complaint had not worked a holiday in over a year. He was told to schedule her for the next one.

He then asked about filing a formal complaint and was told his job was scheduling. Petty asked Seib for a copy of the holiday policy but she did not produce it to him.

59. Later that day, Petty approached Taybior to provide an example of Seib's continuing interference in his scheduling. He told Taybior she felt it was retaliation and that she was harassing him. Taybior's response was "harassment is a dirty word" and redirected him to scheduling.

60. Petty continued to highlight Seib's retaliatory behavior towards him, and Taybior told him to find another approach and that it was his responsibility to address it because "he was the one who was offended."

61. Getting nowhere with Taybior, Petty against asked about filing a formal complaint and Taybior told him to "sit, crawl, then walk before you run."

62. Petty reminded Taybior that he had previously asked how to file a complaint in the "DocsInk" app. Taybior responded that rather than report [Seib], she wanted Petty to "talk to her."

63. When Petty asked how many times he had to complain about the same thing, Taybior said "as many times as it takes, that's life" and that his treatment was his own fault because he was "not reacting properly to being slapped." Petty reminded her that he had already made several reports to corporate.

64. Taybior responded "corporate is not here to stop the slap" and proceeded to mock Petty, imitating a child crying about being slapped.

65. At that point, Petty told Taybior he felt uncomfortable and ended the meeting.

66. Later that day, Howe and Bauman from the home office called Petty. Petty reminded them of the complaints about racial disparity in scheduling and his complaints that Seib

was retaliating against him after his return from FMLA, and complained of discrimination. These complaints constitute statutorily-protected activity.

67. Howe instructed Petty to return his work phone and remain at home pending investigation.

68. On September 11, 2020, Defendant told Petty it was unable to substantiate his claims but since he was unhappy and uncomfortable, they were terminating him for "bad job fit" even though Petty had no performance issues.

### III. CAUSES OF ACTION

### COUNTS I & II

### RACE DISCRIMINATION – TITLE VII & SECTION 1981

69. Plaintiff hereby incorporates by reference paragraphs one (1) through sixty-eight (68) above as if the same were set forth at length herein.

70. Defendant took adverse employment actions against Plaintiff based upon his race in violation of Title VII and Section 1981, including when it terminated his employment.

71. Defendant's actions, as alleged above, deprived Plaintiff of equal employment opportunities and otherwise adversely affected the terms and conditions of his employment.

72. Defendant's unlawful actions were intentional, willful, and done in reckless disregard to Plaintiff's rights as protected by Title VII and Section 1981.

### COUNTS III & IV

### RETALIATION – TITLE VII & SECTION 1981

73. Plaintiff hereby incorporates by reference paragraphs one (1) through seventy-two (72) above as if the same were set forth at length herein.

74. Defendant took adverse employment actions against Plaintiff based upon his engagement in protected activity in violation of Title VII and Section 1981, including when it terminated his employment.

75. Defendant's actions, as alleged above, deprived Plaintiff of equal employment opportunities and otherwise adversely affected the terms and conditions of her employment.

76. Defendant's unlawful actions were intentional, willful, and done in reckless disregard to Plaintiff's rights as protected by Title VII and Section 1981.

### COUNTS V & VI

### RACE HARASSMENT/HOSTILE WORK ENVIRONMENT – TITLE VII & SECTION 1981

77. Plaintiff hereby incorporates by reference paragraphs one (1) through seventy-six (76) above as if the same were set forth at length herein.

78. Plaintiff was subject to unwelcome harassment based upon his race.

79. Said harassment was both severe and pervasive.

80. Plaintiff reported said harassment to Defendant.

81. Defendant failed to properly investigate Plaintiff's reports or take any remedial action in response to Plaintiff's reports.

82. Defendant's unlawful actions were intentional, willful, and done in reckless disregard to Plaintiff's rights as protected by Title VII and Section 1981.

### COUNTS VII & VIII

### HARASSMENT/HOSTILE WORK ENVIRONMENT BASED UPON PROTECTED ACTIVITY – TITLE VII & SECTION 1981

83. Plaintiff hereby incorporates by reference paragraphs one (1) through eighty-two (82) above as if the same were set forth at length herein.

84. Plaintiff was subject to unwelcome harassment based upon his statutorily-protected activity.

85. Said harassment was both severe and pervasive.

86. Plaintiff reported said harassment to Defendant.

87. Defendant failed to properly investigate Plaintiff's complaints or take any remedial action in response to Plaintiff's reports.

88. Defendant's unlawful actions were intentional, willful, and done in reckless disregard to Plaintiff's rights as protected by Title VII and Section 1981.

## COUNTS IX & X

## VIOLATIONS OF THE FMLA

89. Plaintiff hereby incorporates by reference paragraphs one (1) through eighty-eight (88) above as if the same were set forth at length herein.

90. Defendant failed and refused to apply the same standard to Plaintiff as it has applied to similarly situated employees who have not requested FMLA qualifying leave and/or taken FMLA leave.

91. Defendant took unlawful actions against Plaintiff, including, but not limited to, when it demoted him, changed his work assignments, and terminated his employment following his FMLA leave.

92. Defendant's actions, as alleged above, constitute interference with Plaintiff's FMLA rights and/or constitute retaliation for requesting and/or taking FMLA leave.

93. Plaintiff has suffered damages as a result of Defendant's unlawful conduct, including lost wages.

94. Defendant's unlawful actions against Plaintiff were intentional, willful, and done in reckless disregard of Plaintiff's rights as protected by the FMLA.

**REQUESTED RELIEF**

WHEREFORE, the Plaintiff, Michael Petty, by counsel, respectfully requests that the Court find for him and order that:

1. Defendant reinstate Plaintiff to the same position, salary and seniority that he had prior to her termination or pay front pay and benefits to her in lieu thereof;

2. Defendant pay lost wages and benefits to Plaintiff;

3. Defendant pay compensatory damages to Plaintiff;

4. Defendant pay punitive damages to Plaintiff;

5. Defendant pay liquidated damages to Plaintiff;

6. Defendant pay pre- and post-judgment interest to Plaintiff on all recoverable sums;

7. Defendant pay Plaintiff's reasonable attorneys' fees and costs incurred in litigating this action; and

8. Defendant pay to Plaintiff any and all other legal and/or equitable damages this Court deems just and proper to grant.

Respectfully submitted,

*s/ Meghan U. Lehner*
Meghan U. Lehner, #25899-49
Eric J. Hartz, #29676-49
CLEVELAND LEHNER CASSIDY
6214 Carrollton Ave., Suite 200
Indianapolis, IN 46220
Tel: 317-388-5424
Fax: 317-947-1863
Email: meghan@clcattorneys.com
          eric@clcattorneys.com

           Counsel for Plaintiff, Michael Petty

## DEMAND FOR JURY TRIAL

  The Plaintiff, Robert Culver, by counsel, respectfully requests a jury trial as to all issues deemed so triable.

           Respectfully submitted,

           *s/ Meghan U. Lehner*
           Meghan U. Lehner